CHARLES A. SHIELDS ET AL. *v.* VERMONT MUTUAL FIRE INSURANCE COMPANY.

May Term, 1929.

Present: WATSON, C. J., POWERS, SLACK, MOULTON, and WILLCOX, JJ.

Opinion filed October 1, 1929.

226

228

*Fred L. Laird* and *George L. Hunt* for the defendants.

*Charles A. Shields* and *David S. Conant pro se.*

MOULTON, J. This is an action of contract upon the lightning clause in two polices of fire insurance, only one of which, covering a certain barn, is here in question. The answer is a general denial and special defenses. After trial by jury the verdict was for the plaintiff. The case is here on the defendant's exceptions. The clause in question is as follows: "*Lightning Clause.* This policy also covers direct loss or damage to the property insured by lightning (meaning thereby the commonly accepted use of the term 'lightning' and in no case to include loss or damage by cyclone, tornado or windstorm) whether fire ensues or not."

The first question to be considered arises upon exceptions to the denial of the defendant's motions for a nonsuit, and for a directed verdict; and to the admission in evidence of a letter from the defendant to the plaintiffs (Plaintiffs' Exhibit

7), dated August 5, 1927, and saying, with reference to the policy in question: ''After careful examination of this case, we have decided to deny liability, as the barn was blown down and not struck by lightning.''

The motion for a nonsuit was upon the ground that on the uncontradicted evidence no proof of the alleged loss or damage had been executed; that the alleged loss exceeded $100, and that no written permission to pay had been given the defendant by the insurance commissioner, wherefore the defendant was expressly prohibited from paying any such loss or damage, by force of No. 160, Acts 1921.

The grounds for the motion for a verdict here material are a practical reiteration of the grounds stated in the motion for a nonsuit; and that, since no proof of loss had been received, no such loss was yet due and payable by force of G. L. 5568, and the action was prematurely brought.

The plaintiffs admit that no proof of loss was executed by them, or sent to the defendant, but they rely upon the denial of liability contained in the letter above quoted as a waiver of such proof by the defendant. To this the defendant replies, in effect, that although a stipulation in an insurance policy relating to proofs of loss may be waived, and is waived by a denial of liability, the statutes above mentioned contain limitations upon the right of action, which are not contractual in nature and cannot be waived.

By G. L. 5568 it is provied that: ''The amount of the loss under a fire insurance policy shall be due and payable in sixty days after receipt by the insurance company of satisfactory proofs, and the insured may commence an action after the expiration of that time to recover the same.''

And by section 1, No. 160, Acts 1921: ''In case of loss or damage to property insured by a fire insurance company transacting business in this State, such a fire insurance company shall not pay any loss or damage until after the expiration of forty-five days from the date when proof of loss is executed; provided that nothing contained in this section shall prevent the payment of a loss to any property owner when the aggregate loss under policies covering the risk does not exceed one hundred dollars; Provided, also, that upon application from an insurance company or its authorized representative, written permission to make earlier payment on any loss may be given said

company or its authorized representative by the insurance commissioner, and immediately upon issuing such permit, the insurance commissioner shall notify and grant permits to any other companies known to be interested in the risk. For a violation of this section the insurance commissioner may suspend the authority of the company to transact business in this State for such length of time, not exceeding one year, as he may deem advisable.''

We do not think that the action was prematurely brought under G. L. 5568. It has repeatedly been held that a clause in an insurance policy stipulating for the presentation of sworn proof of loss is for the benefit of the insurer and may be waived by it, and is waived by an unconditional denial of liability for the loss, which is equivalent to saying to the plaintiff that the company would not pay if such proof were furnished. Therefore a compliance with that provision of the policy would be an idle formality which the law will not require. *Mellen* v. *U. S., etc., Ins. Co.*, 83 Vt. 242, 247, 248, 75 Atl. 273; *Clarke* v. *Travelers' Ins. Co.*, 94 Vt. 383, 391, 111 Atl. 449.* And so, too, where the policy contains a condition that no action can be maintained upon it, and no loss is payable under it, until a limited time has elapsed after satisfactory proof of loss has been received by the insurer, suit may be brought at once upon the denial of liability, although the time limited by the policy may not have expired. *Frost* v. *North British, etc., Ins. Co.*, 77 Vt. 407, 415, 60 Atl. 803. A clause in a policy limiting the time within which suit may be brought thereon, being for the benefit of the company, may be waived. *Bates* v. *German Comm. Acc. Ins. Co.*, 87 Vt. 129, 130, 88 Atl. 532, Ann. Cas. 1916C, 447.

The foregoing authorities, it is true, have to do with the waiver of contractual stipulations, contained in the policy. But in many jurisdictions, where the form and contents of a policy are prescribed by statute, it has been held that a stipulation

---

*Mr. John S. Ewart, in his articles "Waiver in Insurance Cases," 18 Harv. Law Review, 364, and "Waiver or Election," 29 id., 724, maintains that the true basis of this doctrine lies in an election by the insurer not to insist upon the operation of a clause in the policy, placed there for its benefit, and points out certain procedural changes if this view is adopted. But the result would be the same as in the cases above cited, and as no procedural question is here involved, we forbear further discussion of this distinction.

therein providing for the filing of proof of loss may be waived by the insurer. *Hicks* v. *British Am. Assur. Co.,* 162 N. Y. 284, 56 N. E. 743, 745, 746, 48 L. R. A. 424; *Simons* v. *Ins. Co.,* 277 Pa. 200, 120 Atl. 822, 823; *Hamblin* v. *Newark Fire Ins. Co.* (1927), 48 R. I. 473, 139 Atl. 212, 213, 214; *DeNoya* v. *Fidelity, etc., Ins. Co.,* 110 Okla. 235, 236, 237 Pac. 125; *Nichols* v. *Ins. Co.,* 125 Iowa, 262, 268, 101 N. W. 115; *Liebing* v. *Mut. Life Ins. Co.,* 269 Mo. 509, 520, 191 S. W. 250, 253.

Indeed it has been held that such a requirement, being for the benefit of the insurer, may be waived by it, whether imposed by contract or by statute. *Jewett* v. *Quincy Mut. Fire Ins. Co.,* 125 Me. 234, 132 Atl. 523, 524 (a case much like the instant one, in that the action was brought under the lightning clause of the policy, and the claim of the defense was that the building was demolished by wind); *Levi* v. *Palatine Ins. Co.,* 75 N. H. 551, 78 Atl. 617, 618; *Flynn* v. *Orient Ins. Co.,* 77 N. H. 431, 92 Atl. 737, 738; *Oakes* v. *Ins. Co.,* 112 Me. 52, 90 Atl. 707, 708 (a statutory arbitration clause held susceptible of waiver by the company in a manner other than the one provided therein). In *Williams* v. *Vermont Mutual Fire Ins. Co.,* 20 Vt. 222, 231, a provision as to the place and time of bringing suit under a policy contained in the charter of the company, was held to be a limitation upon the legal liability of the insurer, and, no suit having been brought in accordance therewith, there was no indebtedness which might be reanimated by an acknowledgment or new promise; thus, in effect, holding that this provision of the charter could not be waived by the company. To the same effect in *Dutton* v. *Vermont Mutual Fire Ins. Co. of Vermont,* 17 Vt. 369, 374. But, in commenting upon the former of these cases, it is said in *Bates* v. *German Comm. Acc. Co., supra,* 87 Vt. at page 131, 88 Atl. 534, Ann. Cas. 1916C, 447, that it "is predicated upon a theory of insurance contracts, which has long been abandoned."

The defendants attempt an analogy between this case and such decisions as *Petraska* v. *National Acme Co.,* 95 Vt. 76, 80, 113 Atl. 536, and *Parker* v. *Pittsfield,* 88 Vt. 155, 158, 92 Atl. 24, 26, in support of the contention that there can be no waiver of a statutory requirement that no suit shall be brought until a certain notice has been given. But these authorities are not in point. In the Petraska Case the failure to make claim for compensation by an injured employee was held to be a jurisdictional

defect in a proceeding before the commissioner of industries, and being a statutory limitation upon his authority it could not be enlarged, diminished, or destroyed by express consent, or waived by acts of estoppel. *Parker* v. *Pittsfield, supra,* was an action against a town to recover for injuries alleged to have been caused by the insufficiency of a culvert. It was held that the statute (P. S. 4031) providing that no action should be maintained against a town in such a case, unless a written notice of prescribed contents should first be given by the injured party, "pertains to the remedy, and it is essential to the right to maintain an action to prove that the person injured or damaged gave notice to the town in compliance therewith," and that a failure to object to the notice when offered in evidence was not a waiver of material defects therein. It is not necessary to decide whether in such a case, the giving of the statutory notice can be waived by the town. In *Pratt* v. *Sherburne,* 53 Vt. 370, 374, it is said that the purpose of the notice "is to give the town such notice of the injury that they in the exercise of reasonable diligence could ascertain its character and extent." In *Wheelock* v. *Hardwick,* 48 Vt. 19, and again in *Gregg* v. *Weathersfield,* 55 Vt. 385, the question was as to the authority of the selectmen to bind the town by their statements or vote. But the liability of towns for defects in highways or bridges is purely statutory in its nature. *Kent* v. *Lincoln,* 32 Vt. 591, 595, 596; *Hyde* v. *Jamaica,* 27 Vt. 443, 457; *Gay* v. *Cambridge,* 128 Mass. 387, 388. And there is authority for the proposition that such a statutory liability cannot be extended beyond the limits of the statute, nor an action maintained to enforce it without an observance of all statutory requisites. *Gay* v. *Cambridge, supra; Hubbard* v. *Inhabitants of Fayette,* 70 Me. 121, 124, 125; *Hoyle* v. *Putnam,* 46 Conn. 56, 61 (semble); *Starling* v. *Bedford,* 94 Iowa, 194, 62 N. W. 674, 675 (in which case waiver of proofs of loss, although required by statute, by an insurance company was expressly recognized, but waiver of the statutory notice in a highway case was denied).

Not unduly to labor the point, we hold that the provisions of G. L. 5568 were for the benefit of the insurer; that they might be waived by it, and were so waived by the denial of liability.

A different question is presented by the terms of No. 160, Acts 1921. That statute contains an absolute prohibition to the insurance company to pay any loss or damage until after the

expiration of forty-five days from the date when the proof of loss is executed, subject however to certain exceptions which are not applicable here.

As we have seen, the defendant waived the execution of the proof of loss, as it might do, by a categorical denial of liability. It is to be observed that more than forty-five days elapsed between the denial, on August 5, 1927, and the commencement of this suit, on October 24, 1927.

It has been said that where a statute provides that no action shall be brought within a limited time after proofs of loss have been furnished, if such proofs are waived at a given date, the time would begin to run from the date of the waiver. *Harrison* v. *Hartford Fire Ins. Co.* (C. C.), 59 Fed. 732, 734, 735; *Flynn* v. *Orient Ins. Co.*, 77 N. H. 431, 92 Atl. 737, 738.

While the statute under consideration only forbids the payment of any loss or damage until a certain time has elapsed after the execution of proofs of loss, we think that the same principle applies. It cannot be said that the statute is for the benefit of the insured alone. Possibly its purpose is to give the authorities of the State an opportunity, if desired, to investigate the circumstances of the fire before settlement of loss. But there is no provision for the filing of the proof of loss with any public official, or for the giving of notice to anyone that it has been executed. The execution of the proof of loss is important, so far as this statute is concerned, only as fixing the commencement of the period within which the loss must not be paid. The time, which is not for the insurer's benefit, cannot be waived by it. But the execution of the proof of loss is for its benefit, and, as we have seen, may be waived. Since, therefore, the starting point of the time is an act by the insured, which the insurer has the power to dispense with, if it chooses, it is immaterial whether this act takes place, or something which is precisely equivalent to it, and which may be substituted for it at the option of the insurer—that is, the waiver by denial of liability. Where this has been done, the situation is as if the proof had been executed, and the prescribed time commences to run from that moment. See *Young* v. *Penn. Fire Ins. Co.*, 269 Mo. 1, 187 S. W. 856, 859. Since the requisite time was accomplished in the instant case the suit was not premature.

The case of *Otis* v. *Insurance Co.*, 122 Me. 239, 119 Atl. 612, is cited by the defendant. In that case there was a statute for-

bidding payment of loss until a certain time had passed after the execution of proof of loss. After proof had been filed, and the loss adjusted, but within the time limited, a trustee process was served upon the insurance company in a suit by a creditor of the insured. It was held, that, because of the statute, as well as for other reasons, at the time of service, the debt was not due absolutely, and without contingency. It is apparent that this case is not opposed to the views we have expressed.

No error appears in the denial of the motions as based upon the grounds stated nor in the admission in evidence of the letter containing the denial of liability.

In addition to the grounds for its motion for a directed verdict already considered, the defendant insists upon others which may be summarized as follows: That there was no evidence tending to show that the alleged loss and damage, or any of it, was caused by lightning, in whole or in part; that whether lightning was the cause or part of the cause of the loss and damage could not on the evidence be decided without indulging in speculation and conjecture; that there is no substantial evidence to support a verdict for the plaintiffs; that there was no evidence tending to show what part of the loss and damage was caused by lightning as distinct from that caused by wind, and that since damage by wind was expressly excluded by the policy, there was no basis by which how much of the loss or damage was caused by lightning and how much by wind could be determined without an indulgence in conjecture and speculation.

In the consideration of the motion upon these grounds, we view the evidence in the light most favorable for the plaintiff. *MacDonald* v. *Orton,* 99 Vt. 425, 427, 134 Atl. 599; *Dumont* v. *Cromie,* 99 Vt. 208, 211, 130 Atl. 679; *Kimball* v. *New York Life Ins. Co.,* 96 Vt. 19, 25, 116 Atl. 119; *Shortssleeves* v. *Troville,* 95 Vt. 468, 471, 117 Atl. 819. Testimony which is not impossible, though it may be unreasonable, inconsistent, or contradictory, is for the jury's consideration. *Robey* v. *B. & M. R. R.,* 91 Vt. 386, 388, 100 Atl. 925. If there is any substantial evidence supporting plaintiffs' claim, the question is for the jury, and, where intelligent and fair-minded men may reasonably differ in the conclusion to be drawn from the evidence, it cannot be said that there is no evidence. *Picknell* v. *Bean,* 99 Vt. 39, 41, 130 Atl. 578; *Ronan* v. *Turnbull Co.,* 99

Vt. 280, 284, 131 Atl. 788. The question is, was there substantial evidence from which, if believed, and excluding the effect of modifying evidence, the jury could reasonably infer the existence of facts necessary to support the plaintiffs' case. *Ste. Marie* v. *Wells,* 93 Vt. 398, 108 Atl. 270, and cases cited.

██ The evidence introduced by the plaintiffs in support of their case was entirely circumstantial. If, therefore, the denial of the motion for a verdict, upon the grounds above stated is to be sustained, the circumstances taken together must reasonably tend to support the inference; the conclusion from the facts offered must be at least the more probable hypothesis with reference to the possibility of other hypotheses. *Wellman* v. *Wales,* 97 Vt. 245, 253, 122 Atl. 659; *Woodhouse* v. *Woodhouse,* 99 Vt. 91, 112, 130 Atl. 758.

The evidence, taken in the most favorable light for the plaintiffs, tended to show the following facts: On July 27, 1927, at about four o'clock in the afternoon, the neighborhood was visited by an electrical storm, accompanied with wind and rain. The barn in question was seen to be standing at about two o'clock by a passer-by. After the storm had ceased it was found to be demolished, with the easterly side and the roof thrown upon the ground. No witness saw it fall. No fire ensued.

Jesse M. James, a witness on behalf of the plaintiffs, gave his testimony by deposition. He deposed that the storm came up very quickly, from the west; that there was "an awful heavy crash of thunder and awful sharp crash of lightning." The thunder came very soon, "within half a minute, probably not half a minute" after the lightning. At the time the witness was sitting in his house, which was 2,500 feet slightly northwesterly from the barn. The lightning came from the east, and his judgment was that it struck pretty close by. With the thunder he heard a tearing sound, "an awful heavy crash," and this sound came from the east of his house. On cross-examination, he described the flash as "a ball of fire coming right at me, a little bigger than my fist, I thought it was coming right into my face. That is the way it looked to me," and when he first saw it, it was very near some apple trees not far from his house, but, according to a plan introduced by the defendant, not in the line between the James house and the barn. At the

time there came quite a strong gust of wind from the northwest which lasted four or five minutes.

Mrs. Jesse James, who was in the house with the former witness, her husband, testified that she saw a bright light, and "there was a bang, then there was directly after that, there was a rumbling sound and then of something falling." The lightning and the thunder seemed to come all together. The sound she described came from the direction of the barn. The wind came from the northwest. It was a strong wind, but not so much wind as she had seen many times.

Edwin T. Symons lived a little to the northwest from the barn and one-half mile distant. He heard a severe clap of thunder to the east. In his judgment it was rather close; "it didn't sound a great ways off." The wind was from the northwest, and came with the storm. He was indoors and only knew it was blowing by seeing the branches of the trees near his house sway.

Greta Leavitt lived about a mile from the barn, which was northwest from her house. She heard a particularly heavy clap of thunder to the northwest. The wind was from the northwest; it was not a very hard wind. A limb was blown off a maple tree at her father-in-law's house nearby.

Gertrude Leavitt lived very near the previous witness. She heard one hard clap of thunder and saw a flash of lightning. The report followed immediately after the flash. She thought that the sound of the thunder came from the north, and that the general direction of the barn from her house was northwest. It was a hard thunderstorm. The wind was from the northwest, just an ordinary wind, "not awfully hard," and she had often seen it blow harder. The trees did not bend very much, but a limb was blown off a tree across the road from her house.

L. D. Leavitt, the husband of the foregoing witness, testified, as she did, that the report followed the flash at once; that the thunder was in the northwest, and the barn was north or a little northwest from his house. The wind was northwest, quite a wind, but no hurricane. He produced a piece of the limb which had been blown from the tree, which became an exhibit, and showed a weakening by decay.

Sam Gonyeau, who lived about two miles from the barn, heard one hard crash of thunder. He testified that the wind was west or southwest, in a kind of a blast.

Such, in a condensed form, was the testimony of those who experienced the storm and described the nature and intensity of the electrical disturbance and the wind which accompanied it. Other evidence relating to the wreckage of the barn and the indication of a lightning stroke remains to be considered.

The barn was 186 feet long, by 46 feet wide. It was constructed with 12 bents, or transverse frames. There was a door at each end and, in front of each door, an inclined driveway, or ramp leading to the ground. The doors faced north and south, respectively. The length of the barn faced to the east and west. (It may be well to remark that a plan made from a survey showed that the points of compass relating to the situation of the barn, as described by the witnesses, were not entirely accurate, but for purposes of this opinion we take them to be as stated.) Under the eaves on the easterly side, placed end to end, horizontally upon the top of the uprights which formed the support of the outer wall, was a series of timbers to the upper side of which the rafters were attached, called the main plate. The barn was hip-roofed, and at the break in the roof there was another series of horizontal timbers known as the purline plate. Inside the barn, between the third and fourth bents counting from the north, was a built-up silo. The barn contained 20 to 30 tons of baled hay, bound with wire.

After the storm the east side and south end of the barn lay flat upon the ground. The north end and almost all of the west side remained standing. A section of the roof which had covered the north, east, and center part of the structure lay with the shingle side up. The side wall lay with the outer side up. Toward the southeast the roof lay with the shingle side down, and the side wall with the inner side up. The timber which formed the northeast section of the main plate was split in two lengthwise, very close to the heart of the timber. The southeast section of the main plate was also split lengthwise, but not in nearly equal parts as was the other. A part of the northeast section presented a charred appearance. The split was in the shape of a gouge or trough extending the entire length of the timber. "The inside bottom quarter," said a witness who had examined it, "and the top half of the plate remained with the roof section, the outside bottom quarter with the side wall section." The split ran pretty nearly true with the heart of the timber, and followed the grain of the timber, and was split in

from the surface in two directions to the center or heart. It was approximately the depth of the tenon pegs and holes. The plate was of fir, a soft wood, 8″ x 8″ in size, and was approximately 30 feet in length. The uprights, upon which the plates rested were hard wood and were not splintered.

The ramp leading to the southerly door was partly constructed of earth and stones. A so-called ''bridge'' of timber connected the solid portion with the door. Some of the stones forming the east wall of the ramp were found after the catastrophe to be moved out of place from six inches to eight feet. The disturbed condition extended eight feet southerly from the northeast corner of the wall. One stone so moved out of place would weigh 800 to 1,000 pounds; another 500 to 600 pounds. There was fresh dirt upon them, and the grass was freshly pressed down. All of the foregoing appeared by the testimony of various witnesses, and by photographs taken by both parties and marked as exhibits.

It is the claim of the plaintiffs that the lightning split the plates at each end of the barn, and then jumped to the side of the southerly ramp, displacing the stones, that when the supporting plates were split, the barn fell by the force of gravity, and that the situation of the débris of the barn is to be accounted for by the nature of its construction and the explosive force of the lightning. The defendant says that the structure was blown down by the wind.

Several expert witnesses were called by the defendant, some of whom testified from their experience and observation of the effects of lightning, others from theoretical knowledge. All agreed in giving as their opinion that the damage was not the result of this agency, and spoke of the absence of certain characteristic marks such as fire, a peculiar splintering, or ''fuzzing'' of the split timbers and indicated points of entrance and exit. It was also said that, if lightning had struck the main plate which was covered and under the eaves, there would have been a disturbance of the roof covering it, since lightning usually comes in at the top of a building; that if the plate had been struck, the discharge would have followed the upright timbers to the ground, or, if it had traveled in the plate, it would have leaped to the wire binding the baled hay, which would be a good conductor; and that there were no indications of damage by lightning in the disturbed wall of the ramp.

But the evidence also tended to show fire does not always result from a stroke of lightning; that there may or may not be indications of charring; that the characteristic "fuzzing," or splintering, does not invariably result, and more frequently appears in hardwood than in soft; that traces of inlet and outlet are not always visible; that timbers may be split from end to end following the grain, and avoiding knots; and on the outside or in the center; that lightning, while it always passes to the ground, does not always enter at the highest point of a building, but seeks the best conductor, and will leap from a poor to a good conductor, so that its course to the ground may be direct or devious. Furthermore, it was in evidence that lightning may injure a building the same time in more than one place; that is an almost immeasurable force, working in a variety of ways and rarely twice alike, and what it may do cannot certainly be foretold. It also appeared that the soft wood plate was a better conductor than the hard wood uprights, and the stones upon which the sills rested were poor conductors; that the moist air outside the barn was a better conductor than the dry air inside; and that lightning which strikes into the ground will move nearby stones. A witness called by the plaintiffs described an occasion observed by him when lightning struck a tree, leaped from it to a spruce rafter on the under side of the roof of a shed, and split it, without affecting the board roofing which covered it. A part of this rafter was introduced in evidence.

With the evidence standing thus as to the storm, the condition of the wreckage, and the nature and results of the lightning, we consider that the question whether the barn was so struck was for the jury.

The transcript of testimony is voluminous. We have not attempted to state all the details appearing on one side or the other, but all those matters which have been called to our notice have received due consideration.

In support of the defendant's claim that the barn was blown down by wind, stress is laid upon what is claimed to have been the weak construction of the barn, and the spaced boarding and apertures appearing in the west side, as well as the situation of the débris. But as to these matters, or the result of them, the evidence was conflicting. So, too, the plaintiffs' evidence, taken most favorably for them, tended to show a

wind not so high or unusual as claimed by the defendant. Here, again, although we do not make an extended statement of the testimony, our conclusion is that there was a question for the jury, and that, the evidence was such as to sustain the finding, which was evidently made, that the entire damage was caused by lightning, the wind not entering into it at all.

The jury viewed the premises, and the plaintiff argues that what they saw was evidence and should be so considered in passing upon the motion for a verdict. It is not necessary for us to pass upon this question. Our conclusion has been reached after an examination of the transcript, and exhibits.

The last ground for the motion for a verdict was that on the uncontradicted evidence, the plaintiffs had no such title, right, or interest in the insured property as would justify a verdict in their favor. It was provided in the policy that it should be void "if the interest of the insured be other than unconditional and sole ownership," and it is claimed that the evidence showed that the plaintiffs held the title, not in their own right, but as trustees for the estate of the late Alexander Dunnett.

This question was not raised by the pleadings. In one paragraph of the defendant's answer it was alleged that the property was held by the plaintiffs as partners, and so it was not covered by the policy which ran to the plaintiffs as individuals. Testimony as to the condition of the title was introduced, without objection, and was material upon the issue presented by the answer. But nothing was said, or claimed, with regard to the provision in the policy as to unconditional and sole ownership, until the motion for a verdict at the close of all the testimony. At that time the claimed defect in title specified in the answer, was expressly waived upon the record.

The defendant argues that the phrase in the complaint, "said barn, then and there being the property of the said plaintiffs" is a material allegation, and so was put in issue by the general denial. But an allegation of property is a very different thing than an allegation of unconditional and sole ownership. And, furthermore, the complaint is in the manner prescribed by G. L. 1801, which relates to actions brought to recover upon fire, life, or accident insurance policies, and this statute provides that: "If the defendant answers by way of

general denial, such answer shall put in issue only the execution of the policy and the amount of the damages.''

■■ A verdict is not to be directed upon an issue not within the scope of the pleadings. ''The fact that the matters which are claimed to constitute the defense appear from evidence necessarily introduced to make out the case, will not enable the defendant to avail himself of them. The evidence received is to be regarded only as bearing upon the issue joined.'' *Poole* v. *Mass. Mut. Acc.·Assn.*, 75 Vt. 85, 88, 53 Atl. 331, 332. And for this reason there was not, as defendant claims there was, a waiver by the plaintiffs of the lack of such an answer by failing to object to the evidence when it was introduced. There was no error in overruling the motion on this ground.

■■ In the deposition of Jesse James, taken at the instance of the plaintiffs, the witness testified, on direct examination, that, at the time of the storm, he was sitting in his house, which, according to the evidence was about 2,500 feet distant from the barn in question, and looking out of the window in the general direction of the barn. He testified that ''there was an awful heavy crash of thunder and awful sharp crash of lightning;'' that he heard the thunder very soon, within half a minute, probably not half a minute after the flash; and that he formed a judgment at the time as to how near the lightning struck. He was then asked, ''What is your judgment about that?'' And, subject to the objection that he was not qualified to express an opinion upon the subject, he answered: ''My judgment was that it struck pretty close by.''

It is argued that, since light travels at the rate of 186,000 feet a second, and sound, in a temperature of 80 degrees Fahrenheit, travels about 1,150 feet a second, the lapse of half a minute between the flash and the sound would show that the stroke was far from the barn, or had no relation to the thunder. Perhaps this would be so, if we should take the language of the witness to have been used with scientific accuracy. But we all know that non-expert testimony is not given with such meticulous regard for the minutiæ of time and space. The witness did not say that half a minute intervened, but that he heard the thunder within half a minute, and probably not that, after the flash. He was evidently trying to describe a very short period of time, and his answer to the objected question came within the rule first enunciated in *Bates* v. *Sharon*, 45 Vt. 474, 481, and since

then many times reaffirmed by this Court, that "Where the facts are of such a character as to be incapable of being presented with their proper force to any one but the observer himself, so as to enable the triers to draw a correct or intelligent conclusion from them without the aid of the judgment or opinion of the witness who had the benefit of personal observation, he is allowed, to a certain extent, to add his conclusion, judgment, or opinion."

See, also, *In re Estate of Clogston*, 93 Vt. 46, 51, 52, 106 Atl. 594; *Mathewson* v. *Mathewson*, 81 Vt. 173, 185, 69 Atl. 646, 18 L. R. A. (N. S.) 300; *Williams* v. *Norton Bros.*, 81 Vt. 1, 5, 69 Atl. 146; *State* v. *Marsh*, 70 Vt. 288, 299, 40 Atl. 836; *State* v. *Bradley*, 64 Vt. 466, 470, 24 Atl. 1053; *State* v. *Ward*, 61 Vt. 153, 181, 17 Atl. 483; and many other cases cited in the opinions above mentioned. In *Mathewson* v. *Mathewson, supra,* this principle is specifically stated to be applicable where a question of time or distance is involved. See, also, *Herrick* v. *Holland*, 83 Vt. 502, 511, 512, 77 Atl. 6.

Plaintiff Conant, while a witness, was asked by defendant's counsel: "As a matter of fact don't you know that you never did execute any such proof of loss?" and answered: "Well, it depends, it would turn upon the definition of the word 'execute.' I showed and proved to the company the loss on this property." The defendant moved to strike out the last sentence of the answer, as not being responsive, and excepted to the denial of the motion. It is conceded, in defendant's brief, that the answer was harmless, if no claim is made by the plaintiffs that it tends to show that a proof of loss was "executed" within the meaning of No. 160, Acts 1921, to which we have heretofore referred. No such claim was made below, and it is expressly disclaimed by the plaintiffs in their brief. They rely upon the denial of liability by defendant as a waiver of the execution of proof of loss. So we pay no further attention to this exception.

The defendant called as a witness Mr. Joseph G. Brown, a former insurance commissioner of the State, who testified that as such commissioner it was his duty to investigate the matter of lightning protection, and, pursuant to this duty he employed Mr. S. L. Dewey to assist him, and that a report was made in connection with the investigation. He was then asked: "You may state whether that report as prepared by you by the assistance of Mr. Dewey as you have stated became substantially

written into the state law relating to lightning protection?"
The evidence was offered as bearing upon the qualifications of
Dewey as an expert in investigating and dealing with the sub-
ject of lightning. It was excluded, and defendant excepted.

Later on, Dewey was called, and after testifying to his
work with the State insurance department, he was asked whether
he made recommendations to the department. Defendant's
counsel offered to show that the witness made recommendations
which were approved and adopted, as bearing upon his quali-
fications, and said, in this connection: "It has been customary
to permit an expert to give a history of what he has done and
what important cases he has testified as a witness in, what other
courts have passed upon him as an expert, and it is along that
line merely that I am offering this."

The question was excluded and defendant excepted.

In neither ruling was there reversible error. Dewey was
found to be an expert and was permitted to testify as such.
The question of his qualification was for the court. *Holbrook
Grocery Co.* v. *Armstrong*, 97 Vt. 197, 203, 122 Atl. 458; *Watriss*
v. *Trendall*, 74 Vt. 54, 57, 52 Atl. 118. Having achieved the re-
sult to obtain which the excluded evidence was offered, the de-
fendant was not harmed, and the error, if any, cured. It is
argued that the evidence was material for the consideration of
the jury in determining the weight to be given to the expert's
testimony. But this ground was not stated, in the court below,
and so we do not give it attention. A question not raised below
is not for consideration here. *Capital Garage Co.* v. *Powell*, 97
Vt. 204, 210, 211, 122 Atl. 423.

Certain exceptions were taken to the exclusion of
questions asked upon the direct examination of defendant's wit-
ness Lane, which, as the point is the same in each, will be con-
sidered together. Lane was qualified and permitted to testify,
as an expert contractor and builder. He testified to an exami-
nation of the barn, after the injury to it, and identified certain
photographs, which were received as exhibits. He further testi-
fied that the outside boarding was "rough sawed lumber, that is,
not planed, and a very poor grade, practically all fir, and not
placed close together, or if it was placed close together it must
have been laid green and shrunk very materially," and that
there were portions of the barn on the westerly side over which
the boarding had never been placed. He also said that the

rafters were joined at the peak "on a vertical cut and resting opposite and against each other and spiked some with one and some with two spikes" and, "I think it is customary to insert a ridge at that point and generally, why I think in most instances to spike more thoroughly." The so-called spaced boarding and the apertures in the westerly side of the barn, were shown in the various photographs. The witness was then asked: "What relation did that condition (spaced boarding and apertures) have to the strength of the barn with the wind blowing from the west or northwest?"

Upon objection, the question was excluded, and the following offer was made: "We offer to show that the strength of the barn without the wind would be one thing, and the strength of the barn with the wind would be another, that is what we want to show."

An exception was then taken to the exclusion. But there was no error. Nothing was said as to the strength and velocity of the wind, and the offer did not indicate to the court what the witness was expected to say. *Cummings* v. *Ins. Co.*, 101 Vt. 73, 80, 142 Atl. 82; *Paul* v. *Newman,* 101 Vt. 240, 143 Atl. 294, 295; *State* v. *Tubbs,* 101 Vt. 5, 20, 139 Atl. 769; *Smith* v. *Reynolds,* 94 Vt. 28, 40, 108 Atl. 697; *Capital Garage Co.* v. *Powell,* 99 Vt. 244, 248, 131 Atl. 10.

The witness was then asked: "Suppose there was a strong wind coming from the west or northwest, with the west side of that barn and the boarding in the shape that you have described, what effect would that have on the barn?" The offer was to show that under those conditions the barn and its resistance would be far less than it would have been if it had been constructed without those openings. The question was excluded, and an exception noted.

Although the witness had qualified as an expert contractor and builder, he had said nothing as to his knowledge of the effect of wind, and the resistance of buildings to it. The suggestion of counsel that, in constructing buildings, he had to take into account the strength of them in all reasonable weather, with wind and without wind, cannot take the place of evidence as to his qualifications in this respect. The court expressly ruled that he was not an expert on wind and wind velocity, and it is self-evident that the effect on the structure would depend upon the force and velocity of the wind. As we have seen, the ques-

248

tion for the qualifications of the witness as an expert was for the court to determine, and its decision is conclusive, unless it appears from the evidence to have been erroneous, or was founded upon an error in law. *Capital Garage Co.* v. *Powell,* 97 Vt. 204, 210, 122 Atl. 423.

A further offer was made to show by the same witness that, with the westerly side of the barn in the condition as testified, and a strong wind as described by all the witnesses, coming from the west or northwest, the tendency would be for the wind to get into the barn, and, the rafters being nailed as the witness had said, to lift the roof off ''and to spread it just as it took place here.'' Again the ruling excluded the pending question, and an exception was taken. What we have said above regarding the finding as to the competency of the witness is, of course, applicable here, but aside from that, the offer went beyond the question. The wind assumed was not the ''strong wind'' of the question, but ''a strong wind'' as testified to by all the witnesses. The witness had not testified that the rafters were not properly nailed, but that he thought it was customary, in most instances, to spike more thoroughly. The offer, therefore, was broader than the question, and in part, not responsive to it, and its exclusion was for this reason proper. ''One cannot propound a question incompetent in its substance and narrow in scope, and then, by offering to prove irresponsive though material matters, thereby save a good exception. Evidence offered must be responsive to a competent question, in order that its exclusion be error.'' *Hallwood Cash Register Co.* v. *Prouty,* 196 Mass. 313, 315, 82 N. E. 6, 7.

Hugh Phillipps, a witness called by the defendant, testified on direct examination, that, after an examination of the southeast main plate of the barn, he did not think that the injury to the timber was caused by lightning. On crossexamination, he testified that when he visited the premises, he saw evidence of a pretty large force having been there at some time. He said he knew nothing about the force that a bolt of lightning would, or might, exercise if it struck the buildings; that it might depend upon the voltage of the lightning, but he could not say whether it would entirely because he was not an expert. In redirect examination he was asked: ''What in your opinion was the force that scattered that building as you saw it?''

Upon objection the question was excluded. It was claimed that the witness was qualified to state what force it was that put the barn down, and defendant offered to show by the witness that it was wrecked and thrown down by the force of wind. The court ruled that the witness was not qualified as an expert upon this matter, and excluded the question. The defendant excepted. No error appears. What we have elsewhere said regarding the qualifications of experts is applicable here. *Capital Garage Co.* v. *Powell, supra.* It is urged that the question was made admissible by the cross-examination, the substance of which is given above. But, however this may be, the ruling was as to the competency of the witness. The materiality of the offered evidence is not in question.

Walter D. Brockway, an adjuster employed by the defendant, testified to his knowledge of the habits or general tendency of lightning, when it strikes a building, and the indications of lightning having struck a building, as gained from his investigation, of claims for loss so caused. From his observation, he said that lightning almost always went in on upright timbers, naturally following them to the ground; and that his opinion was that lightning did not strike the barn in either of the two main plates, because it would naturally have followed the first timber or the first upright to the ground. On cross-examination, by plaintiffs' counsel, he said that he believed electricity follows the course of least resistance. This question was asked: "Now assuming, Mr. Brockway that the posts that supported this plate were a poorer conductor of electricity than the air itself, would it follow the posts or would it strike, go through the air to the ground?"

Objection was made that this was not proper cross-examination, but the question was allowed, and defendant excepted. The answer was: "Well, if they were a poorer conductor, probably that would be true, but I don't think that it would be." The last phrase was struck out, without objection on the part of the defendant. It is argued that the witness was not qualified as a theoretical expert, since he had testified only from his experience and practical observation, and that therefore it was error to permit him to answer. But the objection did not go to his competency. The question was entirely proper on cross-examination, in view of his testimony on direct that lightning naturally followed upright timbers to the ground, and later, on

250

cross, that the line of least resistance would be taken by it. It is true that it appears from the record that the court considered the witness' qualifications before allowing the question, but the question of his competency was not raised either by the objection or the exception, and so cannot avail the defendant here. *Townshend* v. *Townshend*, 84 Vt. 315, 318, 79 Atl. 388; *Massucco* v. *Tomassi*, 80 Vt. 186, 192, 67 Atl. 551.

■ The plaintiffs are both members of the bar, and in the trial of this case, acted as attorneys for themselves, as they were permitted to do by county court rule 1. They were, also, witnesses in their own behalf. Two exceptions were taken by the defendant to language used by the plaintiff Conant in stating his objections to certain questions asked of the witness Lane by defendant's counsel. It is claimed that these statements presented incompetent, immaterial and improper subject-matter, and were made for the purpose of prejudicing the jury by one who was not only counsel, but party.

Nothing, however, appears to satisfy us that these statements were made otherwise than in good faith, for the purpose of presenting the objections to the court, or were made with intent to gain an advantage. At the request of the defendant, the court instructed the jury in the charge that statements made during the trial by the plaintiffs in the conduct of their case as attorneys were not evidence, and must not so be considered. Assuming, even, that what was said was improper, prejudice does not appear. *Douglass & Varnum* v. *Morrisville*, 89 Vt. 393, 430, 95 Atl. 510; *Powell* v. *Merrill*, 92 Vt. 124, 129, 130, 103 Atl. 259. So, too, in the remark by plaintiff Conant to opposing counsel, to which exception was taken, prejudice does not appear, although the incident is to be regretted.

After the defendant had closed its evidence the plaintiffs called Jacob Bailey as a witness, and stated that they expected to qualify him as an expert upon lightning and its damages, for the purpose of rebutting the defendant's expert testimony on this subject. Objection was made that this was not rebuttal, but a part of plaintiffs' opening case, and, after some discussion, the court permitted the plaintiffs to proceed, but stated that they would be held strictly to rebuttal testimony. No exception was taken at that time. Later on the witness was questioned as to his observation of an instance in which it was claimed that a piece of spruce timber was split by lightning. He testified that

on that occasion he noted different indications of lightning, and was asked: "What did you note?" Objection was made that it was not rebuttal. The offer was, in effect, to show that the timber showed a clean split, and not a splintering, fuzzy condition such as the defendant's witnesses had testified was always found after a lightning stroke. The court remarked that it thought that the offered evidence was rebuttal upon that proposition, and the defendant excepted upon the ground that it was not. The court then stated that it ruled as a matter of discretion, and an exception was taken upon the ground that there was an abuse thereof. A further exception was taken, in advance, to all the line of inquiry "to save interruption," and, from time to time, other exceptions, which it is not necessary particularly to notice, because the same ruling applies to them all.

██ The order of the reception of evidence lies in the discretion of the trial court. *Titus* v. *Gage*, 70 Vt. 13, 15, 39 Atl. 246; *Meserve* v. *Folsom*, 62 Vt. 504, 511, 20 Atl. 926; *Slack* v. *Bragg*, 83 Vt. 404, 412, 76 Atl. 148; *Chamberlin* v. *Fuller*, 59 Vt. 247, 252, 9 Atl. 832; *Goss* v. *Turner*, 21 Vt. 437, 439. As is the case in all rulings resting in discretion, it is reviewable only where an abuse is shown. The defendant, however, insists that the court ruled as a matter of law, in admitting the evidence. It is true, as we have seen, that the court expressed the opinion that certain evidence was rebuttal, to which an exception was taken; but immediately thereafter, stated specifically that the ruling was made as a matter of discretion. A ruling that can be made as a matter of discretion will be presumed to have been so made, unless the contrary affirmatively appears from the record. *Murray* v. *Nelson*, 97 Vt. 101, 110, 122 Atl. 519; *Parkhurst* v. *Healy's Estate*, 97 Vt. 295, 296, 122 Atl. 895; *Slack* v. *Bragg*, 83 Vt. 404, 412, 76 Atl. 148; *State* v. *Fairbanks*, 101 Vt. 30, 34, 139 Atl. 918; *Temple* v. *Atwood*, 99 Vt. 434, 435, 134 Atl. 591; *State* v. *Long*, 95 Vt. 485, 491, 115 Atl. 734; *Maynard* v. *Westfield*, 87 Vt. 532, 536, 90 Atl. 504. We think that the ruling was so made here, and consequently we give no attention to the question whether the evidence was or was not proper rebuttal.

██ The defendant argues that it was surprised and put to disadvantage by the admission of the testimony, in that it had no opportunity to investigate the occurrence related by

the witness, or to verify his statements. But no application was made for an adjournment for this purpose, and nothing was said in the court below as to surprise on the defendant's part. The exception as taken appears by the transcript to have been upon the ground that it was an abuse of discretion to admit in rebuttal evidence which, it was claimed, was a part of the main case. An abuse of discretion does not appear upon the record. This is not such a situation as was presented in *Phelps* v. *Utley*, 92 Vt. 40, 43, 101 Atl. 1011, where, after the close of all the evidence, the plaintiff was permitted to introduce evidence of a fact which had not theretofore appeared, and the defendant was denied a requested delay of the trial so that he might have time to get witnesses to meet the testimony. It was there said that opening the case to let in the witness was in the discretion of the court, "but opening the door to the plaintiff, and closing it to the defendant was error." If, in the instant case, the defendant desired opportunity to meet the testimony (assuming, but not deciding, that it was not rebuttal), it was its duty so to inform the court, and to ask for the requisite delay for that purpose, if the offered evidence was received.

The piece of timber which was claimed to have been struck by lightning was admitted, subject to the objection that there was no evidence tending to show that the injury to it was so caused. In its brief the defendant says that, "if the plaintiffs had kept within the court's ruling (confining the witness to rebuttal testimony) there would have been no evidence tending to show that the splitting * * * * was the result of lightning." But there was evidence to this effect, and, as we have seen, it was properly admitted in the exercise of the court's discretion. No error appears. Other exceptions were taken to the testimony of this witness, but they are covered by what we have said above.

The defendant seasonably presented various numbered requests for instructions, and excepted to the failure of the court to comply with certain of them. The exceptions were taken only by referring to the requests by number. We have repeatedly held that exceptions so taken, without pointing out the matter relied upon and indicating the claimed error in the charge as given, are too general to require attention. *Robinson* v. *Leonard*, 100 Vt. 1, 10, 134 Atl. 706; *Woodhouse* v. *Woodhouse*, 99 Vt. 91, 146, 130 Atl. 758, and cases cited; *Bristol* v.

*Bristol R. R. Co.*, 91 Vt. 223, 227, 100 Atl. 37. See, also, *In re Bean's Will*, 85 Vt. 452, 459, 467, 82 Atl. 734, wherein occurs an exhaustive discussion of the rule as to general exceptions to the denial of requests, and its development and justification.

An exception was taken to the charge of the court as follows: "You are instructed that if you find the collapse of the barn to the extent enumerated by the evidence was occasioned by lightning without other intervening forces other than gravity, whether fire ensued or not, that would be a direct loss by lightning." In taking the exception, counsel said: "We think that there should be expressly stated to the jury that the invasion of wind to any extent would deprive that result from the quality of being a direct damage."

It is argued that taking the lightning clause of the policy in connection with another provision that, "if a building or any material part thereof fall except as the result of fire, all insurance by this policy on such building or its contents shall immediately cease," the words "direct loss" in the former clause cannot be interpreted to include any loss from the fall of the building, if the wind in any way entered into the result. But it is enough to say that the court had elsewhere substantially so charged. The jury had already been instructed that damages could only be awarded for direct loss or damage caused by lightning, that damage caused by windstorm was expressly excluded; and that, if it should be found that the damage was caused partly by lightning and partly by wind, it would be the jury's duty to determine how much of the whole damage was caused by the lightning alone, and to award damages only for that. This, we think, sufficiently covered the subject-matter of the exception as taken.

Another exception was taken to the charge that if the jury should find that the plaintiffs were entitled to recover interest on the amount due should be allowed from October 5, 1927, which was 60 days from the time of the denial of liability. The ground of the exception was that, since no proof of loss was filed, there was no basis for the allowance of interest. As we have seen, G. L. 5568 provides that the amount of the loss shall be due and payable in 60 days after receipt of the proof of loss. Interest is to be computed from the time when money becomes due and payable, under the contract. *Vermont and Canada R. R. Co.* v. *Vermont Central*

*R. R. Co.*, 34 Vt. 1, 65; *Dunnett & Slack* v. *Gibson,* 78 Vt. 439, 444, 63 Atl. 141. If proofs of loss had been furnished, interest might have been claimed after sixty days from that time. *Palatine Ins. Co.* v. *O'Brien,* 107 Md. 341, 68 Atl. 484, 487, 16 L. R. A. (N. S.) 1055. Since the denial of liability made unnecessary the proof of loss, the charge was as favorable to the defendant as it was entitled to receive. *Frost* v. *North British, etc., Ins. Co.,* 77 Vt. 407, 415, 60 Atl. 803.

After verdict, the defendant moved to set it aside. Almost all of the grounds of the motion are covered by what we have said in the disposition of the motion for a verdict. Two grounds only remain for consideration: (6) The damages awarded are excessive and unsupported by any substantial evidence. (7) Assuming that the jury might reasonably find that the barn was struck by lightning, there was no substantial evidence upon which the jury could reasonably award the damages stated in said verdicts.

 The amount of the verdict was $2,871.50. The court charged the jury in substance that, if they should decide that the destruction of the barn was caused solely by lightning, the amount which should be awarded would be the difference between the fair cash value of the farm before the catastrophe with the barn as it then stood, and the fair cash value of the farm afterwards with nothing left except the wreckage of the barn, and in getting at this difference they might consider such factors as the size and location of the farm and the size, condition, and age of the barn before it fell, and the cost of replacement, which would be the expense of erecting a new building similar to the old one, with the proper deduction to cover the amount of depreciation immediately before the catastrophe. If they should find that the destruction was caused by lightning and some other force acting concurrently, it would be their duty to apportion the damage as best they could, and to award the plaintiffs such portion of the whole value lost as they should find was caused by lightning alone. This was satisfactory to the defendant, for no exception was taken to it, and, indeed, it was in substantial accord with the charge which was approved in *Brown* v. *Vermont Mut. Fire Ins. Co.,* 92 Vt. 272, 277, 102 Atl. 1042. However, in its brief, the defendant says that while the fair cash value of the barn might be ascertained by the method outlined in the charge, yet since the barn was not wholly

destroyed, such value must be reduced by the salvage value. But no complaint having been made with the charge in this respect, it became the law of the case. *Saliba* v. *N. Y. C. R. R. Co.*, 101 Vt. 427, 144 Atl. 194, 199. It was the duty of counsel, if there were any claimed shortage or error in the charge, to call the matter to the court's attention so that it might then be corrected. A retrial will not be granted because the court failed to charge upon some point which counsel had permitted to pass unnoticed. *Dailey* v. *Bond*, 94 Vt. 303, 304, 305, 111 Atl. 394. See, also *Woodhouse* v. *Woodhouse*, 99 Vt. 91, 147, 148, 130 Atl. 758.

So far as the damages were claimed to be excessive, the motion was addressed to the discretion of the court, and is reviewable only in the event of an abuse thereof. *Dyer* v. *Lalor*, 94 Vt. 103, 114, 109 Atl. 30; *Woodhouse* v. *Woodhouse, supra,* 99 Vt. at page 153, 130 Atl. 758; *Jacobs* v. *Loyal Protective Ins. Co.*, 97 Vt. 516, 527, 124 Atl. 848. But the ground that there was a want of supporting evidence for the amount returned presents a question for review. *Smith* v. *Martin,* 93 Vt. 111, 123, 106 Atl. 666; *French* v. *Whelden,* 91 Vt. 64, 69, 99 Atl. 232. In determining it, the evidence must be taken in the light most favorable for the plaintiff, as in the case of a motion for a directed verdict. *Farnham & Sons* v. *Wark,* 99 Vt. 446, 451, 134 Atl. 603.

As we have seen, there was evidence from which the jury could find that the entire injury was caused by lightning. In the last quadrennial appraisal, the farm which was of 400 acres, was set at $4,000. The plaintiffs' evidence tended to show that the value of the barn, at the time of its destruction was $4,000, and that, after that event, the remains were worth $500, but that it would cost $200 completely to dismantle the wrecked building and pile the lumber. Other evidence was introduced by the plaintiff tending to show the amount and value of the timber and shingles used in the barn, from which it could have been inferred by the jury that the cost of reconstruction, so far as these items alone were concerned, without considering the cost of hardware and labor, etc., would be $2,940. True, the defendant's evidence was to the contrary, but we are here concerned only with the tendency of the evidence, and not with its weight. *Cummings* v. *Connecticut General Life Ins. Co.*, 101 Vt. 73, 85, 142 Atl. 82; *Higgins* v. *Metzger,* 101 Vt. 285, 143 Atl. 394, 398. It cannot be said that the amount of damages

awarded was unsupported by the evidence. Much less can it be said that there was an abuse of discretion in the denial of the motion to set the verdict aside.

We have given consideration to all the points raised by the defendant's brief, and fail to find reversible error.

*Judgment affirmed.*